UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA , | ) | DOCKET NO.  5:08CR54-V |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | GOVERNMENT'S AMENDED |
| GREGORY ROLAND PRUESS | ) | MEMORANDUM OPPOSING |
| _____ | ) | <u>CONSTITUTIONAL CHALLENGE</u> |

The United States of America, by and through Anne M. Tompkins, United States Attorney

for the Western District of North Carolina, hereby files its Amended Memorandum of Law Opposing

Constitutional Challenge of 18 U.S.C. § 922(g)(1) as applied to felons convicted of non-violent

crimes and, for the reasons set forth, respectfully requests that this Honorable Court deny Pruess'

constitutional challenge to 18 U.S.C. §922(g)(1) as applied to Pruess.

<u>ISSUE</u>

Whether the prohibition against possession of ammunition by a convicted felon whose prior

convictions were nonviolent violates the Second and Fifth Amendments to the United States

Constitution.

<u>FACTUAL BACKGROUND</u>

1.    <u>PROCEDURAL HISTORY</u>.

Defendant Gregory Roland Pruess was initially charged by criminal complaint on October

22, 2008, with possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

(J.A. at 9-10.)[1]  In a supporting affidavit attached to the complaint, Special Agent David Schauble

_____

[1]  J.A. refers to the Joint Appendix that was filed in Pruess' direct appeal to the Fourth
Circuit Court of Appeals.  Referenced excerpts from the J.A. are attached hereto as Attachment
A.

with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") stated that during an investigation of another individual, referred to in the affidavit as "CI-1," CI-1 reported that he had had conversations with Defendant about obtaining both conventional ammunition and high-explosive 40 mm rounds and that he had previously sold military gear and ammunition to Defendant. (*Id.* at 11.) During subsequent recorded conversations between Defendant and CI-1, Defendant agreed to buy such items from CI-1, and on October 21, 2008, Defendant took custody and control of "7.62 x 51 mm (military .308) manufactured by Lake City, Missouri and 5.56 mm linked ammunition," also manufactured by Lake City, Missouri. (*Id.* at 12.) A week after the criminal complaint was filed, Defendant was indicted by the Grand Jury for the Western District of North Carolina for the same offense. (*Id.* at 37.)

On February 27, 2009, Defendant filed a motion to dismiss the indictment based on the "invalidity of underlying statute and felony convictions." (J.A. at 79-86.) In his motion, Defendant challenged the indictment on the basis that the original felony conviction that disqualified him from possession a firearm or ammunition, such as that involved in this case, was based on government misconduct in misrepresenting that the 60 mm mortar rounds involved in that offense were "destructive devices" for purposes of his conviction for transferring such devices in violation of 26 U.S.C. § 5861(e). (*Id.* at 79-82.) Defendant also argued that 18 U.S.C. § 922(g)(1) violates the Second Amendment to the United States Constitution as established by the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008). (*Id.* at 83-85.) The Government filed a response in opposition to Defendant's motion, (*Id.* at 396-20), and this Court denied Defendant's motion to dismiss on July 2, 2009, (*Id.* at 431-34.)

2

On July 6, 2009, the parties entered into a plea agreement, pursuant to which Defendant entered into a conditional plea of guilty, reserving his right to appeal, inter alia, the denial of his motion to dismiss. (J.A. at 435.) As part of his plea agreement with the Government, Defendant "stipulate[d] and agree[d]" that on October 21, 2008, he met with a confidential informant and agreed to purchase ammunition. (J.A. at 436.) That same day, Defendant paid the informant $550 in exchange for 78 rounds of belted 7.62 mm ammunition and 400 rounds of 5.56 mm ammunition, ammunition that was placed in Defendant's car at Defendant's direction. (*Id.*) Defendant later admitted to "the commission of the offense." (*Id.*)

This Court conducted a plea hearing and colloquy in accordance with Federal Rule 11, finding, at its conclusion, that Defendant's plea was knowingly and voluntarily entered. (DE:52).[2] The probation office submitted a Presentence Report ("PSR") in preparation for Defendant's sentencing hearing on August 12, 2009, which report was revised less than a month later (DE:31), and on September 21, 2009, this Court sentenced Defendant to 21 months' imprisonment, (DE: 41). Defendant was released, having served this term of imprisonment, on June 30, 2010.

The Fourth Circuit Court of Appeals vacated Defendant's judgment and remanded the case to this Court for further proceedings consistent with its unpublished opinion. *United States v. Pruess*, Case No. 09-5061 (4th Cir., March 14, 2011) (unpublished) (DE: 49). In its unpublished opinion, the Fourth Circuit directed this Court to reconsider its prior ruling regarding the constitutionality of 18 U.S.C. §922(g)(1) by applying the two-prong analysis outlined in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), to determine whether the statute violates Defendant's right to bear arms.

---

[2] DE refers to "docket entry."

2. <u>OFFENSE CONDUCT</u>.

Pruess purchased one can (778 rounds) of 7.62 mm ammunition and two drums (400 rounds) of 5.56 mm ammunition from a confidential informant (CI) on October 21, 2008 (PSR, ¶¶ 2, 10, 11). Pruess' ammunition purchase resulted from law-enforcement-supervised conversations between Pruess and the CI from July to October 2008. During those conversations, the CI advised Pruess that the CI had a military friend who had just returned from Iraq with military items to sell. Pruess then expressed an interest in purchasing 5.56mm ammunition, 7.62mm belted ammunition, 40mm grenades, parachute flares and .223 caliber ammunition from the CI (PSR, ¶¶ 7-13). In recorded conversations on August 29, 2008, Pruess responded to the CI's request for a .223 caliber AR-15 by stating that there were a lot around for $200 to $400, and that Pruess "found a nice one last, uh . . . I gave like $850.00 for it. It's an M4 kind of a carbine." (DE: 38, Exhibit A, ATF Report, ¶¶ 11-13). Significantly, Pruess never advised the CI in the recorded undercover conversations that Pruess was purchasing the 7.62mm and 5.56 ammunition for the purpose of testing Pruess' invention that he now claims is the <u>sole</u> reason for Pruess' ammunition purchase.[3]

Pruess initially advised the CI that Pruess would pay $50 for each 40mm grenade, and that Pruess would take $1,000 worth (a total of 20 grenades at $50 per grenade) (PSR, ¶ 9). Pruess agreed to purchase four (4) 40mm grenades, two (2) drums of 5.56mm ammunition and one can of 7.62 mm ammunition for a total price of $550 (PSR, ¶ 10). Pruess paid $550 to the CI for the 7.62mm and 5.56mm ammunition and 40mm grenades, taking possession of only the ammunition

---

[3]

In fact, the CI advised ATF that in the CI's pre-law-enforcement supervised sales of 5.56 ammunition to Pruess prior to July 2008, Pruess told the CI that Pruess and his "buddies were going to have fun with the ammunition"  (DE: 38, Exhibit G, ATF Report, ¶ 11).

4

and agreeing to later take delivery of the four 40mm grenades. Pruess was arrested immediately upon his receipt of the ammunition (PSR, ¶ 13). The 40mm grenades for which Pruess had paid were never displayed or delivered to Pruess during the undercover operation because of the severe injury and fatality risks associated with live explosives.

Pruess made a post-arrest statement admitting that Pruess knew he was prohibited from possessing ammunition and that Pruess could not legally possess it. Pruess also acknowledged that he apparently had an addiction for ammunition (PSR, ¶ 14; DE: 38, Exhibit B, ATF Report, ¶¶ 2-3). Pruess admitted that Pruess had attempted to purchase the 40mm grenades that he had negotiated and paid for, claiming, however, that Pruess intended to dismantle the live grenades, make them inert and sell them for a profit (PSR, ¶ 15; DE: 38, Exhibit B, ATF Report, ¶ 3). Regarding prior purchases by Pruess from the CI of military items before the CI began cooperating with law enforcement authorities, Pruess acknowledged that 99-100% of military items the CI had offered for sale was "probably stolen" (DE:38, Exhibit B, ATF Report, ¶ 4). Significantly, Pruess' post-arrest statement acknowledging his guilt in unlawfully purchasing and possessing the 7.62mm and 5.56mm ammunition did not include any declaration by Pruess regarding his alleged claim now that Pruess had purchased the ammunition solely "to have others use it to test the durability of his DRAM device." (PSR, ¶ 20).

3. PRUESS' PRIOR CRIMINAL HISTORY.

Defendant was indicted on August 1, 1994, with the first offense pertinent to his arguments in this case. On that date, Defendant was charged by the grand jury with twelve firearms offenses, including four counts of possession of unregistered devices, in violation of 26 U.S.C. § 5861(e); four counts of transferring devices, in violation of 26 U.S.C. § 5861(a); and four counts of possession of

5

destructive devices with obliterated identification and lot number, in violation of 26 U.S.C. §5861(h). (J.A. at 434a-34c.) Within each set of offenses, the first three counts related to 40 mm grenades, while the fourth related to a 60 mm mortar round. (*Id*.) Defendant ultimately pled guilty to having transferred a 60 mm mortar round, in violation of 26 U.S.C. § 5861(e), and was sentenced to 12 months' imprisonment, to be followed by three years of supervised release. (*Id*. at 434d-34f.)

On November 3, 1997, Defendant was again indicted by the grand jury, this time charged with four counts of engaging in the business of importing, manufacturing, and dealing in explosive materials without a license, in violation of 18 U.S.C. § 842(a); five counts of transporting and possessing explosives as a convicted felon, in violation of 18 U.S.C. § 842(i); one count of carrying an explosive during the commission of a felony, in violation of 18 U.S.C. § 844(h)(2); four counts of engaging in the business of importing, manufacturing, and dealing in firearms while not licensed to do so, in violation of 18 U.S.C. § 922(a); three counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g); two counts of transporting, shipping, receiving, and possessing firearms with obliterated or altered serial numbers, in violation of 18 U.S.C. § 922(k); two counts of possession of machine guns, in violation of 18 U.S.C. § 922(o); two counts of possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d); and two counts of transferring devices, in violation of 26 U.S.C. § 5861(e). (*Id*. at 434k-34p.) Nearly two years later, Defendant was again indicted by the grand jury, this time charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). (*Id*. at 434w.) Defendant ultimately pled guilty to and was convicted of all of the counts in the 1997 indictment, except for two of the counts charging him with possession of explosives by a convicted felon; the single count charging him with carrying an explosive during the commission of a felony; the two counts charging him with

6

possessing firearms with obliterated serial numbers; and the two counts charging him with possessing unregistered devices. (*Id*. at 434q.) The district court sentenced Defendant to 108 months' imprisonment as to 14 of the counts and to 60 months' imprisonment as to the remaining four counts, to be served concurrently. (*Id*. at 434r.) Defendant also pleaded guilty to the single §922(g) offense charged in the 1999 indictment, as well as to having committed that offense while on supervised release, for which the district court sentenced him to eight months' imprisonment (*Id*. at 434x.), to be served consecutively to his sentence related to the 1997 indictment. (*Id*. at 434y.) Defendant appealed certain of these convictions and sentences, but the Fourth Circuit affirmed the district court's judgments. *United States v. Pruess,* 13 Fed. App'x 87 (4th Cir. 2001) (unpublished) (1999 indictment); *United States v. Pruess*, 2 Fed. App'x 262 (4th Cir. 2001) (unpublished) (1997 indictment). Defendant ultimately sought, several times, to obtain post-conviction relief from his various convictions, but no such relief was granted, and, in each case, the Fourth Circuit affirmed the district court's judgments denying post-conviction relief. See *Pruess v. United States*, 121 Fed. App'x 543 (4th Cir. 2005) (denying Rule 60(b) motion as relitigating claims already denied in resolving earlier motion under 28 U.S.C. § 2241); *United States v. Pruess*, 120 Fed. App'x 498 (4th Cir. 2005) (construing Rule 60(b) motion as successive motion under 28 U.S.C. § 2255); *Pruess v. United States*, 117 Fed. App'x 884 (4th Cir. 2004) (relief sought under 28 U.S.C. § 2255); *United States v. Pruess*, 48 Fed. App'x 869 (4th Cir. 2002) (relief sought under 28 U.S.C. § 2241).

While Defendant was seeking post-conviction relief from the district court's various judgments, he also sought the return of certain property. In March of 2004, the district court conducted a hearing on Defendant's claim that the Government had seized items that did not qualify as "explosives" or "destructive devices" under 18 U.S.C. § 921(a)(4) and 26 U.S.C. § 5845(f).

7

(WDNC District Court Case No. 5:97CR300-V, DE (unnumbered), dated 3/24-25/04 (hearing) and 5/57/04 (filed transcript)).  To support its position that the devices qualified as explosives or destructive devices, the Government presented the testimony of ATF Explosives Enforcement Officer Rich Campbell.  (*Id*. at 232-33.)  Officer Campbell testified that he had twice examined all of the explosives that were seized from Defendant in 1997, once in 2000 and once shortly before the hearing in March of 2004, and that all of the devices constituted explosives.  (Id. at 234-35.)

On cross-examination, Defendant, acting pro se, questioned Officer Campbell concerning the 40 mm ammunition he had failed to register in 1994, asserting that he had been told that it was not considered a destructive device.  (J.A. at 254.)  In responding to Defendant's questions, Officer Campbell referred to ATF Ruling 95-3, which made clear that "ammunition designed to be used against individuals," including ammunition designed for use in "37, 38 millimeter devices," constitutes a "destructive device," such that it must be serialized and tracked as part of the National Firearms Transition Record.  (*Id*. at 250-52.)  When asked by Defendant whether "it would be '95 that the government is now considering 40 millimeter ammunition as a firearm, as a destructive device," Officer Campbell replied, "[y]es."  (*Id*. at 253-54.)  Defendant then noted that such ammunition "can't be used for anything without the launcher," (*Id*. at 256), and Officer Campbell again referred to Ruling 95-3:

> A.      . . . .You can possess a 40 millimeter cartridge that is a destructive device or has an antipersonal effect without the means to launch it and it is not a destructive device.  When you possess both, then you do possess a destructive device.  By holding a 40 millimeter cartridge, whether it be a flare or a smoke, that doesn't necessarily mean that it is a destructive device.  A flare would be an explosive, not a destructive device.

Q.  So it's your opinion, then, that just a 40 millimeter round by itself is not a destructive device. It's – it's an explosive, then. . . . Is a 40 millimeter high explosive cartridge a destructive device by itself?

A.  It's an explosive by itself. In conjunction with a 40 millimeter launcher, it is a destructive device.

(*Id*. at 257.)

Over two-and-a-half years later, on December 18, 2006, Defendant filed a petition for writ of error coram nobis, asserting that Officer Campbell's testimony made clear that the ammunition that Defendant had transferred in 1994 and that had served as the basis for his 1996 felony firearms conviction did not qualify as a "destructive device" as required for his conviction under 26 U.S.C. § 5861(e). (WDNC District Court Case No. 5:06CV159-V, DE: 19-2.) The Government filed two responses in opposition to Defendant's motion, attaching to one response an affidavit from Officer Campbell, in which Officer Campbell stated that the "Military 60mm, M49A4, HE mortar round," such as the round Defendant pled guilty to having transferred in 1994, "is properly classified as a 'destructive device' under the [National Firearms Act]" and, specifically, 26 U.S.C. § 5845(f)(1)(A). (*Id*. at 408.) Addressing his 2004 testimony, Officer Campbell noted that during his testimony, he was asked to testify about items seized by ATF from Defendant in October of 1997. (*Id*. at 409.) With respect to his cross-examination and the portion of that testimony relied upon by Defendant, Officer Campbell noted that he was discussing ATF Ruling 95-3, in which ATF determined that "37/38 mm gas/flare guns possessed with 'anti-personnel' ammunition . . . are classified as destructive devices" for purposes of the National Firearms Act. (*Id*.) According to Officer Campbell, in referring to 40 mm cartridges, he "was mistaken when [he] spoke" and that "it appears that [he] was thinking of the 37/38 mm cartridges referenced in ATF Ruling 95-3" but because of

9

Defendant's questioning, he "mistakenly stated that Ruling 95-3 also held that 40 mm cartridges, by

themselves, are not destructive devices." (Id. at 410.) Officer Campbell concluded his affidavit by

stating unequivocally that both the 40 mm cartridges referred to in the 2004 transcript, as well as the

60 mm mortar round transferred by Defendant in 1994 and for which he was convicted qualify as

"destructive devices" for purposes of the National Firearms Act:

> 16. To be clear it is both my opinion and ATF's long-standing
> position, that a Military 40 mm, M406, HE grenade, the item
> discussed in the [2004] transcript, is a destructive device as defined
> in the [National Firearms Act].
>
> 17. Significantly, at no time during the March 24, 2004, hearing did
> I testify regarding the classification under Federal law of a Military
> 60 mm, M49A4, HE, mortar round, the precise item for which
> [Defendant] pleaded guilty in 1995 to having unlawfully transferred
> in violation of the [National Firearms Act]. It is my professional
> opinion that such an item is a destructive device as defined.

(*Id*. at 411.)

## ARGUMENT

1.   LEGAL BACKGROUND.

    A.   18 U.S.C. § 922(g).

The Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921-930, imposes comprehensive

restrictions on the receipt, possession, and transfer of firearms and ammunition in or affecting

interstate or foreign commerce, in order "'to make it possible to keep firearms out of the hands of

those not legally entitled to possess them because of age, criminal background or incompetency.'"

*Barrett v. United States*, 423 U.S. 212, 220 (1976) (quoting S. Rep. No. 90-1501 at 22 (1968)).

Provisions of the Gun Control Act codified at 18 U.S.C. § 922(g) make it unlawful for several

categories of persons to possess a firearm or ammunition which has been shipped or transported in

interstate or foreign commerce. These categories include persons convicted of a felony, 18 U.S.C. § 922(g)(1), unlawful users of controlled substances, 18 U.S.C. § 922(g)(3), and persons adjudicated as mentally defective, 18 U.S.C. § 922(g)(4).

Section 922(g)(1) is a successor to, and expansion of, Congress's first effort to disarm criminals, the Federal Firearms Act of 1938, c. 850, § 2(f), 52 Stat. 1250 (FFA), which made it unlawful for any person who had been convicted of a "crime of violence" to receive any firearm or ammunition that had been shipped or transported in interstate or foreign commerce.[4] The term "crime of violence" was defined as "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." *Id.* at § 1(6). The FFA was amended in 1961 to eliminate the "crime of violence" category and substitute any "crime punishable by imprisonment for a term exceeding one year." Pub. L. 87-842, 75 Stat. 757 (Oct. 3, 1961).

B.     *District of Columbia v. Heller.*

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the Supreme Court concluded that the Second Amendment protects an individual right of "law-abiding, responsible citizens to use arms in defense of hearth and home." The Court based this conclusion on an extensive analysis of

---

[4]     Although the FFA did not completely bar weapons possession by persons convicted of "crime[s] of violence," that was plainly its intent. *See* S. Rep. 82, 75th Cong. 1st Sess., at 2 (1937) ("It is believed that the bill * * * will eliminate the gun from the crooks' hands, * * *.").

11

the Amendment's text. *See, e.g., id.* at 576-600. In addition, because the Second Amendment has always been understood to codify "a *pre-existing* right," *id.* at 593 (emphasis original), *Heller* also considered the historical background of the right to keep and bear arms in England and the American colonies. *See, e.g., id.* at 592-95.

*Heller* then held unconstitutional two District of Columbia statutes to the extent that they totally banned handgun possession in the home and required all other firearms within the home to be kept inoperable. *Id.* at 635. The Supreme Court "declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions," *id.* at 634, concluding that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the District of Columbia's handgun ban "would fail constitutional muster." *Id.* at 628-29. In a footnote, however, the Court rejected the notion that rational basis scrutiny was appropriate, concluding that this test "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, * * * ." *Id.* at 628 n.27. The Court also rejected an "interest-balancing" test proposed by Justice Breyer in dissent. *Id.* at 634-35.

At the same time, however, the Court made clear that "the right secured by the Second Amendment is not unlimited," *id.* at 626, and identified several "exceptions," *id.* at 635, which it characterized as "permissible" "regulations of the right[.]" *Id.* The Court declared:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

12

*Id.* at 626-27 (emphasis added).  The Court further cautioned that "[w]e identify these presumptively

lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id.* at 627

n.26.

        C.     *McDonald v. City of Chicago.*

      Last year, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the Supreme Court held

that the Second Amendment also was applicable to the states.  The Court, however, again took the

opportunity to note that Second Amendment rights are far from absolute, and reiterated that *Heller*

"did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of

firearms by felons and the mentally ill' * * * .  We repeat those assurances here."  130 S.Ct. at 3047

(quoting *Heller*, 554 U. S. at 626-27).  Indeed, the Court noted that, in extending the Second

Amendment to the states, "incorporation does not imperil every law regulating firearms."  *Id.*

        D.     *United States v. Chester.*

      In *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit addressed a

Second Amendment challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms

or ammunition by a person who has been convicted of a misdemeanor crime of domestic violence.

The opinion set out a two-part approach to addressing Second Amendment challenges following the

*Heller* decision.  The first test a court must undertake is to determine whether the statute in question

"'imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.'

This historical inquiry seeks to determine whether the conduct at issue was understood to be within

the scope of the right at the time of ratification.  If it was not, the challenged law is valid."  *Id*. at 680

(quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3rd Cir. 2010) (other citations omitted)).

Case 5:08-cr-00054-RLV -DSC   Document 72   Filed 07/22/11   Page 13 of 30

If, on the other hand, the statue in question *does* burden conduct within the Second Amendment's protection, as historically understood, the court should apply "an appropriate form of means-ends scrutiny." *Id*. The Government bears the burden, under this second test, to justify the constitutionality of the statute. *Id*. The Fourth Circuit also held that a claim that fell outside of the "core right identified in *Heller* – the right of a *law-abiding*, *responsible* citizen to possess and carry a weapon in self-defense," was subject to an intermediate scrutiny standard of review. *Id.* at 683 (emphasis in original). In the instant case, the Fourth Circuit remanded this Section 922(g)(1) case to this Court to conduct this two-prong *Chester* analysis. *United States v. Pruess*, 416 Fed.Appx. 274 (4th Cir. 2011)(unpublished).

As for the first test enunciated in *Chester*, the Fourth Circuit stated that the Government had not taken the position that domestic violence misdemeanants were altogether excluded from the Second Amendment as it was understood by the founding generation, and therefore the court proceeded to apply the second, means-end scrutiny, test. *Id.* at 680-81. In *dicta*, the *Chester* panel also stated that it appeared that "the historical data is not conclusive on the question of whether the founding era understanding was that the Second Amendment did not apply to felons." *Id*. at 680. The opinion included this statement even though the historical question had neither been briefed nor argued in that case. As discussed below, the *Heller* opinion's detailed historical analysis, as well as additional authorities, show that, under the first *Chester* test, felons such as this defendant were not within the protections of the Second Amendment as it was understood at the time of its ratification.

14

2.    SECTION 922(G)(1) IS CONSTITUTIONAL ON ITS FACE.

   A.   *Heller* Recognized And Approved Congress's Power To Disarm Criminals.

Section 922(g)(1) prohibits firearms possession by persons, such as the defendant, who have been convicted of an offense punishable by a term of imprisonment exceeding one year.[5]   This statute is "presumptively lawful" under *Heller*, based on that opinion's inclusion of laws prohibiting firearms possession by felons on its list of "permissible" regulations.   *See* 554 U.S. at 635 ("*law-abiding, responsible citizens*" may use firearms in defense of their homes) (emphasis added).

A principal issue in *Heller* was whether the District of Columbia could enforce its licensing requirement in a manner that impaired the plaintiffs' ability to carry a firearm at home.  *Id.* at 574-75, 630.  Before the Supreme Court, the District of Columbia agreed that, if the Court struck down the handgun ban, and Heller then registered a handgun, "'he could obtain a license, *assuming he is not otherwise disqualified*.'" *Id.* at 631 (emphasis added).   The Supreme Court interpreted this concession to mean that Heller could obtain a license if he was "not a felon and is not insane." *Id.* It then tacitly approved these grounds for disqualification by not "address[ing] the licensing requirement." *Id.*  Later, the Court summarized its decision by stating that "*[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home."  *Id*. at 635 (emphasis added).

In *Chester*, the court observed that *Heller's* illustrative list of constitutionally-permissible "longstanding prohibitions" was susceptible of two possible interpretations: 1) that such prohibitions

---

[5]     This pleading will sometimes refer to such persons as "felons," even though that term is not used by the statute, and even though some states categorize as misdemeanors certain offenses punishable by more than one year's imprisonment.

15

were historically understood to be valid limitations on the right to bear arms, or 2) that the prohibitions did not violate the Second Amendment for some other reason. *Id.* at 679. Of greatest significance to the instant case, however, the Fourth Circuit also stated that regardless of whether the Supreme Court considered those offenses cited in its "exemplary list" (which included possession of firearms by felons), to have been outside the protection of the Second Amendment at the time of its ratification, "the Court could still have viewed the regulatory measures as 'presumptively lawful' if it believed they were valid on their face under any level of means-end scrutiny." *Id.* at 679 (footnote omitted).

> B. The Second Amendment Does Not Provide a Right to Possess Firearms to Felons Who Have Been Previously Convicted of a Firearms Offense.

Applying the first test enunciated in *Chester*, the statute is constitutional because it does not burden conduct falling within the scope of the Second Amendment's protection, as understood by the framers at the time of its ratification. The *Heller* opinion, in noting that the Second Amendment has always been understood to codify "a *pre-existing* right," 554 U.S. at 593 (emphasis original), and in embarking on its historical analysis, was consistent with a time-honored jurisprudential approach. For example, in *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897), the Supreme Court declared it to be "perfectly well settled" that the Bill of Rights embodies "certain guaranties and immunities which we had inherited from our English ancestors," and "which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case." The Court further noted that "[i]n incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." *Id.*; *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 95-96 (1990) (Scalia, J.,

16

dissenting) ("The provisions of the Bill of Rights * * * did not create by implication novel individual rights overturning accepted political norms.").

In acknowledging Congress's authority to disarm felons, *Heller* was consistent with the history of the right to arms as it developed in England and the American colonies. *Heller* identified the right protected by the 1689 English Declaration of Rights as "the predecessor of our Second Amendment." 554 U.S. at 593. That document provided: "That the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698).

It is undisputed that both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous. First, the right specifically excluded Catholics, who were viewed as potentially disloyal, and were frequently disarmed on this basis. *See Heller*, 554 U.S. at 582. Moreover, "like all written English rights," this right to arms "was held only against the Crown, not Parliament." *Id.* at 593. Thus, some Protestants had a right to arms, but only as "allowed by law."[6]

Most significantly for present purposes, the English Declaration of Rights did *not* repeal the 1662 Militia Act, which authorized lieutenants of the militia (appointed by the King) to disarm "any person or persons" judged "*dangerous to the Peace of the Kingdome*." 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.) (emphasis added). Indeed, although perceived misuse of this Act partially motivated the adoption of a right to arms in the 1689 Declaration of Rights, subsequent efforts to revise the

---

[6]      By providing that Protestants could have arms "suitable to their conditions" and "as allowed by law," the Declaration of Rights apparently provided only a small minority of upper class Protestants a right to arms. Lois Schwoerer, *To Hold And Bear Arms: The English Perspective*, 76 Chicago-Kent L. Rev. 27, 47-48, 59 (2000).

17

Militia Act were "a failure," and the Act "was to remain in force with only insignificant changes for many years to come." JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS, 123 (1994); *accord* Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009). Moreover, this Act was employed not only against "papists," but also against any others who were viewed as "disaffected or dangerous." Charles, 57 Clev. State L. Rev. at 376-78.

Since individuals could be disarmed without any adjudication of wrongdoing, it is not surprising that they could also forfeit their right to keep or use firearms following conviction of a crime for misusing firearms. Malcolm, for example, notes that a Nottinghamshire laborer was bound "not to shoot again for seven years" after a misdemeanor conviction for "shooting with hailshot." MALCOLM, *supra*, at 10. Moreover, for those caught committing more serious crimes (regardless of whether they involved firearms), forfeiture of firearms was apparently a given. English criminal law was notoriously harsh, prescribing both forfeiture of all property (including, presumably, any firearms) and, frequently, execution for the innumerable crimes designated as felonies. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 95 (1769) (hereinafter BLACKSTONE) (felonies "subject the committers of them to forfeitures"), *id.* at 385 (same); *id.* at 19 (counting 160 acts "to be felonies without benefit of clergy," *i.e.*, "worthy of instant death").

In the Colonies, as well, governments frequently disarmed those they perceived as dangerous, and such restrictions were not viewed as inconsistent with the right to bear arms. Not surprisingly, the inhabitants whose firearm ownership was most restricted were those thought to pose the greatest risk to the nascent societies, namely, Native Americans and those of African descent (both slave and

18

free).  MALCOLM, *supra*, at 140-41; Robert J. Cottrol and Raymond T. Diamond, *The Second*
*Amendment: Towards an Afro-Americanist Reconstruction*, 80 Georgetown L.J. 309, 323-27 (1991).
In addition, as in England, at least one colony disarmed Catholics.  Robert Churchill, *Gun*
*Regulation, the Police Power, and the Right to Keep Arms in Early America: the Legal Context of*
*the Second Amendment,* 25 Law & Hist. Rev. 139, 157 (2007) (Virginia).

Colonial governments also disarmed persons who refused to swear a loyalty oath.  Saul
Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the*
*Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29
(1999); SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS
OF GUN CONTROL IN AMERICA 28-30 (2006).  The Pennsylvania example is instructive.  In 1776,
Pennsylvania adopted a constitution that affirmed that "the people have a right to bear arms for the
defense of themselves and the state."  Pa. Const., Decl. of Rights, Art. XIII.  Shortly thereafter,
Pennsylvania passed a series of Test Acts that had the potential to disarm up to forty percent of the
citizens.  Cornell, 16 Const. Comment at 228; *see also* Churchill, 25 Law & History Rev. at 159 n.49
(describing a December 1775 Connecticut statute disarming any person defaming the acts of
Congress or the state assembly).  According to historian Saul Cornell, these Test Acts showed that
the right to bear arms was viewed as "limited to those members of the polity who were deemed
capable of exercising it in a virtuous manner."  Saul Cornell, *"Don't Know Much About History":*
*The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 672 (2002). At the
same time, the documentary record surrounding the adoption of the Constitution confirms that the
right to keep and bear arms was limited to "law-abiding and responsible" citizens.  Most

19

significantly, the Pennsylvania anti-federalist faction offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and *no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals* * * * .

The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 SCHWARTZ, THE BILL OF RIGHTS, A DOCUMENTARY HISTORY 665 (1971) (emphasis added).

The *Heller* Court found this Pennsylvania Minority proposal to be both "highly influential" and a "precursor" to the Second Amendment. 554 U.S. at 604. These Pennsylvania anti-federalists opposed the Constitution in 1787 because it failed to include a Bill of Rights. Accordingly, their proposal demonstrates that, at the time the Constitution was adopted, even ardent supporters of guaranteeing an individual right to keep and bear arms recognized that criminals and other dangerous individuals should not enjoy its benefits. The Pennsylvania proposal is probative of how the Amendment's supporters viewed the balance between public security and the right to keep and bear arms. *See Heller*, 554 U.S. at 605 (reaffirming that "the Bill of Rights codified venerable, widely understood liberties"); STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT 273 (2008) (arguing that the Second Amendment did not need to contain "an explicit exclusion of criminals from the individual right to keep and bear arms [ ] because this * * * was understood.").

Nor was the Pennsylvania proposal an aberration. In Massachusetts, Samuel Adams offered a similar amendment at the ratifying convention, recommending "that the said Constitution be never construed to authorize Congress * * * to prevent the people of the United States who are *peaceable*

*citizens*, from keeping their own arms." SCHWARTZ, *supra,* at 674-75, 681 (emphasis added).  The

Massachusetts proposal supports the view that "[i]n classical republican political philosophy, the

concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.'

* * * One implication of this emphasis on the virtuous citizen is that the right to arms does not

preclude laws disarming the unvirtuous citizens (*i.e.*, criminals) or those who, like children or the

mentally unbalanced, are deemed incapable of virtue."   Don B. Kates, Jr., *The Second Amendment:*

*A Dialogue,* 49 Law & Comtemp. Probs. 142, 143, 146 (1986); *see* Don B. Kates & Clayton E.

Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339,

1359-62 (2009); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American*

*Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Robert E. Shalhope, *The Armed*

*Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986) (quoting Seventeenth

Century English sources for the proposition that arms should only be placed in the hands of those

interested in preserving "publick Peace").  The First Circuit relied, in part, on these sources in

holding that the right to keep arms does not extend to juveniles.  *United States v. Rene E.*, 583 F.3d

8, 15-16 (1st Cir 2009).

    In short, notwithstanding the uncertainty expressed by the *Chester* panel in its *dicta* on this

subject, historical scholarship demonstrates that, in both England and the colonies, governments

could and did disarm people they perceived as dangerous, including those who had previously

misused firearms.  Furthermore, the Government has found no sources from England or the

American colonies specifically arguing that such persons have a right to own firearms.  Accordingly,

the historical record regarding the right to keep and bear arms provides no basis for deviating in this

case from *Heller*'s conclusion that laws disarming felons are "permissible" under the Second Amendment.

3.    SECTION 922(G)(1) IS CONSTITUTIONAL AS APPLIED
      TO THIS DEFENDANT.

*Heller* described the category of "presumptively lawful regulatory measures" as "exceptions" to the Second Amendment, thereby making clear that such regulations are ordinarily "permissible." Nonetheless, as the *Chester* opinion stated, the Supreme Court's use of the term "presumptively" suggests "the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'"  628 F.3d at 679 (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010).  The *Chester* opinion, however, did not specify what those "one or more" potentially vulnerable regulations might be, and at least one district court has concluded that this portion of *Chester* is likely *dicta*.  *See United States v. Lunsford*, 2011 WL 145195 (S.D.W.Va. 2011).[7]

This case, however, presents no occasion to decide whether an "as applied" challenge to "presumptively lawful regulatory measures" is ever available because Defendant fails to distinguish his case from a run-of-the-mill prosecution under Section 922(g)(1).[8]  First, no court applying *Heller*

---

[7]    The *Lunsford* opinion provides the most extensive analysis the Government has yet found of the application of *Heller* and *Chester* to Section 922(g)(1), and this response has borrowed the analytical framework and some of the language of that opinion.

[8]    A facial challenge, by contrast, (as also raised by the defendant here) would appear to be precluded entirely, as it is unclear how a regulation could be both "presumptively lawful" and facially unconstitutional.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge * * * must establish that no set of circumstances exists under which the Act would be valid"); *see also Washington v. Glucksberg*, 521 U.S. 702, 739-40, and n. 7 (1997) (Stevens, J., concurring in judgments) (facial challenge must fail where the statute has "'plainly legitimate sweep'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

22

has yet found that Section 922(g)(1) is unconstitutional. *See*, *e.g.*, *United States v. Rozier*, 598 F.3d 768 (11th Cir.), *cert. denied,* 130 S.Ct. 3399 (2010); *United States v. Vongxay*, 594 F.3d 1111, 1114-15 (9th Cir.), *cert. denied,* 131 S.Ct. 294 (2010); *United States v. Barton*, 633 F.3d 168 (3rd Cir. 2010); United *States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), *cert. denied,* 130 S.Ct. 1686 (2010); *United States v. Anderson*, 559 F.3d 348, 352 n.6 (5th Cir.), *cert. denied,* 129 S.Ct. 2814 (2009) ; *see also United States v. Price*, 328 F.3d 958, 961 (7th Cir. 2003) (pre-*Heller* case upholding Section 922(g)(1) even under an individual rights interpretation of the Second Amendment).

Second, Defendant has a prior conviction for transfer of a 60mm motor round (26 U.S.C. §5861(e)) (J.A. 434a-34c) and multiple prior convictions involving certain weapons that are so inherently dangerous that their possession is limited only to those persons or entities that are allowed to register them in the National Firearms Registration and Transfer Record. (J.A. at 434q-34r). Defendant's convictions from his November 3, 1997 indictment (J.A. at 434k-34p) include: (1) engaging in business of importing, manufacturing, dealing in explosive materials without a license, in violation of 18 U.S.C. §842(a) (Counts 1-4), (2) shipping of transporting explosive materials in interstate and foreign commerce as a convicted felon, in violation of 18 U.S.C. §842(i) (Counts 5, 8, 9), (3) engaging in business of importing, manufacturing, dealing in firearms without a license, in violation of 18 U.S.C. §922(a) (Counts 11-44), (4) unlawful transport of machine guns by a convicted felon, in violation of 18 U.S.C. §922(g) (Counts 15-18), (5) unlawful transport and possession of machine guns, in violation of 18 U.S.C. §922(o) (Counts 20, 21), and (6) unlawful transfer of machine guns, in violation of 26 U.S.C. §5861(e) (Counts 24, 25), for which Defendant was sentenced to 108 months' imprisonment (*Id.* at 434q-34r.)

23

In the instant case, as a recidivist felon, Defendant purchased one can (778 rounds) of 7.62 mm ammunition and two drums (400 rounds) of 5.56 mm ammunition designed for military machine guns. Significantly, Defendant had also requested to purchase explosive materials in connection with his machine-gun ammunition purchase, but was not permitted to do so because of the inherent risks of using explosive devices in an undercover operation. (DE: 38, p. 2.) Assuming, *arguendo*, that an "as applied" challenge to Section 922(g)(1) could be brought in some cases, it would certainly not be appropriate where, as here, the defendant has previously been convicted of prior firearms offense. If there were *anyone* Congress reasonably had in mind in enacting Section 922(g)(1), it was this Defendant.

Nonetheless, assuming that Defendant possessed any Second Amendment rights at all, under *Chester's* analytical scheme a court must then determine what standard of scrutiny properly applies to Section 922(g)(1). The United States agrees that "rational basis" review is inappropriate here. *Heller*, 554 U.S. at 628 n.27. The defendant may seek to argue that strict scrutiny governs the review of all Second Amendment claims because these rights are "fundamental." Strict scrutiny requires the Government to prove that the regulation at issue furthers a compelling interest and is narrowly tailored to achieve that result. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 882 (2010). For the reasons addressed below, this test does not apply here.

First, strict scrutiny does not apply to all regulations of "fundamental" rights. In fact, as one scholar has recently demonstrated, numerous "fundamental" provisions of the Bill of Rights do not trigger strict scrutiny at all. Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 693-700 (2007). Moreover, even in contexts, such as the First Amendment right to free speech, where strict scrutiny sometimes applies, many cases involve a more deferential standard of review.

24

*Id.* at 695; *see* Ashutosh Bhagwat, *The Test That Ate Everything: Intermediate Scrutiny in First Amendment Jurisprudence*, 2007 U. Ill. L. Rev. 783, 786-800 (2007).

Furthermore, application of strict scrutiny in this case would be inconsistent with the historical understanding of the right to keep and bear arms. As noted above, the founding generation accepted extensive restrictions on who could keep and bear arms, and specifically understood the need to disarm criminals and other dangerous people. A strict scrutiny approach would therefore result in a more expansive right to arms than existed when the Bill of Rights was adopted. Finally, the *Chester* opinion, in addressing a category of persons (domestic violence misdemeanants) who were not within the exemplary list of those as to whom regulation is presumptively constitutional, applied the intermediate scrutiny standard of review. *A fortiori*, no more rigorous standard should be applied to felons-in-possession, a "presumptively reasonable" class.

Under the intermediate scrutiny standard, the Government would have to demonstrate a reasonable fit between the challenged regulation and a substantial government objective. *Chester*, 628 F.3d at 683; see also *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Several relevant factors should properly influence intermediate scrutiny review as applied to Defendant's Second Amendment claim. First, Congress's interest in protecting "the safety and indeed the lives of its citizens" is not merely "substantial" but "compelling." *United States v. Salerno*, 481 U.S. 739, 750, 754-55 (1987). Moreover, for at least 70 years, Congress has sought to protect this interest by preventing firearms from falling into dangerous hands. *Cf. Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 82-83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost[.]"). In order to perform this task, Congress may need to make "predictive judgments" about the risk of dangerous behavior, and such judgments are entitled to "substantial deference" by the courts. *Turner*

*Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 665 (1994). And finally, the primary role in making such judgments properly falls to Congress, not the courts, because Congress is "far better equipped than the judiciary" to collect, weigh, and evaluate the relevant evidence, and to formulate appropriate firearms policy in response. *Id.* at 665-66.

As the Supreme Court has noted, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391 (2000). Even under the more onerous standard of strict scrutiny, therefore, the Government may sometimes justify some restrictions on speech "based solely on history, consensus, and 'simple common sense.'" *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (citing *Burson v. Freeman*, 504 U.S. 191, 211 (1992)); *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S 425, 451 (2002) (Kennedy, J., concurring) ("very little evidence is required"); *id.* at 452 (regulations [on adult bookstores] may rest, in part, on "common experience" and inference).

The proposition that convicted criminals pose a heightened danger of future harm is hardly "novel[ ]." To the contrary, recidivism is a "reality" that legislatures need not ignore. *Samson v. California*, 547 U.S. 843, 849 (2006). Likewise, that removing firearms from a felon will help prevent their future misuse is "plausible," to say the least. Thus, "very little" empirical evidence should be required to satisfy heightened scrutiny in this case.

"It is well-established that felons are more likely to commit violent crimes than are law-abiding citizens. *See, e.g.*, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 1994* at 6 (2002) (finding that within a population of 234,358 federal inmates released in 1994, the rates of arrest for homicides were 53 times the national average)." *United States v. Barton*, 633 F.3d 168,

175 (3rd Cir. 2011).  That Bureau of Justice Statistics study cited in *Barton* (which is available at http://blueshifthome.com/recidivism/statistics/bjs/BJS%20-%20Recidivism%20of%20Prisoners%20Released%20in%201994%20-%20June%202002%20-%20NCJ%20193427.pdf) also showed that among those prisoners who had been released following convictions for weapons offenses, 70.2% were re-arrested and 46.6% were re-convicted within three years.  *Id.* at 8.  This re-arrest rate for those persons previously convicted of weapons offenses was tied for the fifth-highest recidivism rate among the 23 categories of prior convictions listed in the study.[9]  *Id.* at 1.

As the district court in *Lunsford* noted, it is generally accepted that offending society by committing a crime leads legitimately to the loss of certain rights, such as the right to vote or to serve on a jury, and such loss of rights, in itself, can be a form of punishment and a deterrent.  2011 WL 145195 at *7.  "Other than incarceration, there may be no more effective deterrent to crime than the threat of the loss of firearms rights."  *Id.*  Under the intermediate scrutiny test, Section 922(g)(1) is constitutional as applied to this Defendant.

4. SECTION 922(G)(1) DOES NOT VIOLATE THE DEFENDANT'S EQUAL PROTECTION RIGHTS, NOR IS IT UNCONSTITUTIONALLY VAGUE.

On appeal, Defendant's Second Amendment challenge to his conviction was accompanied by his argument on appeal that § 922(g)(1), as applied to nonviolent felons, violates equal protection under the Due Process Clause of the Fifth Amendment, because it infringes on the "fundamental right" of nonviolent felons' right to bear arms.   For all of the reasons set forth above, even if the

_____

[9]     "Released prisoners with the highest rearrest rates were robbers (70.2%), burglars (74.0%) larcenists (74.6%), motor vehicle thieves (78.8%), those in prison for possessing or selling stolen property (77.4%), and those in prison for possessing, using, or selling illegal weapons (70.2%)."  Bureau of Justice Statistics, *Recidivism of Prisoners Released in 1994* at 1.

27

right to possess a firearm can be said to be fundamental, it cannot be said to be a fundamental right of a convicted felon, even a felon whose prior convictions were nonviolent, although they involved dangerous firearms.

An equal protection challenge to § 922(g)(1) is conducted under the rational basis level of scrutiny, *see United States v. Vongxay*, 594 F.3d at 1118-19, and because the prohibition is rationally related to the legitimate governmental interest of public safety, it passes constitutional muster under the Fifth Amendment. *see Giarratano v. Johnson*, 521 F.3d 298, 302-03 (4th Cir. 2008) (legislation is upheld as consistent with equal protection under rational basis scrutiny as long as "the classification drawn by the statute is rationally related to a legitimate state interest); *see also Lewis v. United States*, 445 U.S. 55, 65-66 (1980).

Defendant also argued on appeal that Section 922(g)(1) is unconstitutionally vague, and violates his equal protection rights. He asserted that the statute is unconstitutional because different persons would be disqualified or not due to their having been convicted, on the one hand, in a state where an offense was punishable by more than one year, or, on the other hand, in a state where such an offense was punishable by less than a year. He also challenged the constitutionality of the statute because it excepts from its prohibition those felons who have been convicted of anti-trust offenses.

In *Hill v. Colorado*, 530 U.S. 703, 732 (2000), the Supreme Court rejected a void-for-vagueness challenge because the statute at issue contained "common words" ("protest, education, or counseling," "consent," "approaching") that "anyone would understand." *Id.* As the Fourth Circuit has noted, "A statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds." *United States v. Whorley*, 550 F.3d 326, 334 (4th Cir. 2008). Section 922(g)(1), also, uses common words that anyone would

28

understand ("convicted," "any court," "crime," "punishable," "more than one year," "firearm," and "ammunition").

The Supreme Court has upheld federal firearm laws and sentencing enhancements despite the fact that there may be substantial differences based upon the state in which a defendant received his prior conviction. For example, in *Logan v. United States*, 552 U.S. 23, 26 (2007), the defendant argued that his sentence enhancement under Section 924(e)(1) was invalid because his prior conviction would have been disregarded had it been sustained in several other states; the Court, however, concluded that Congress had a valid reason for the manner in which it structured the statute. *See also Vongxay*, 594 F.3d at 1118-19 (rejecting an equal protection claim, identical to this Defendant's, in a 922(g)(1) case).

As for the decision by Congress that those convicted of restraints of trade or other anti-trust violations are not so inherently dangerous as to merit their prohibition from possessing firearms, that was a rational decision by the legislature which, again, is not relevant as applied to this Defendant, a dangerous-weapons' recidivist in unlawful possession of military machine-gun ammunition suggesting a high potential for danger to the community. As previously stated, Defendant is exactly the type of person Congress had in mind in enacting Section 922(g)(1).

CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Honorable

Court deny Pruess' constitutional challenge to 18 U.S.C. §922(g)(1) as applied to Pruess.

RESPECTFULLY SUBMITTED, this the 22nd day of July, 2011.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

s/ Thomas A. O'Malley
THOMAS A. O'MALLEY
Assistant United States Attorney
Bar:  State of Florida/310964
Attorney for the Plaintiff
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
(704) 344-6222 (office)
(704) 344-6629 (facsimile)
tom.o'malley@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on the 22nd day of July, 2011, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following: Peter

Adolph, Assistant Federal Defender, at Peter_Adolph@fd.org.

s/ Thomas A. O'Malley
THOMAS A. O'MALLEY
Assistant United States Attorney

30